NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1183                                          Appeals Court

COMMONWEALTH  vs.  AUGUSTO LOPEZ.

No. 15-P-1183.

Middlesex.      March 6, 2017. - May 24, 2017.

Present:  Carhart, Massing, & Lemire, JJ.[1]


Rape.  Child Abuse.  Enticement of Minor.  Evidence, First
    complaint, Relevancy and materiality, Credibility of
    witness.  Witness, Credibility.


    Indictments found and returned in the Superior Court
Department on May 17, 2012.

    The cases were tried before Kenneth W. Salinger, J.


    Jane Larmon White, Committee for Public Counsel Services,
for the defendant.
    Jessica Langsam, Assistant District Attorney, for the
Commonwealth.


    MASSING, J.  The defendant was convicted of two counts of

rape and abuse of a child under sixteen years of age, aggravated

by an age difference of ten years or more, see G. L. c. 265,

_____

    [1] Justice Carhart participated in the deliberation on this
case prior to his retirement.

§ 23A(b), two counts of rape of a child by force, G. L. c. 265,
§ 22A, and one count of enticement of a child, G. L. c. 265,
§ 26C.  The charges arose from a single incident involving a
twelve year old girl.  The only evidence of the crime was the
testimony of the child, who was fifteen years old at the time of
trial.  At issue is the judge's decision to admit the testimony
of the child's "therapeutic mentor" that the child lacked the
ability to engage in "imagination play."  We conclude that the
testimony was improperly admitted to prove that the child was
incapable of telling lies and that its use for this purpose was
prejudicial, warranting a new trial.

Background.  a.  The crime.  When the child was twelve
years old she lived next door to the defendant, whom she called
"Pachoo."  The defendant lived with Chrissy, who was a friend of
the child's mother, and Chrissy's three children, two of whom
were younger than the child.  The defendant was Chrissy's boy
friend and was fifty-five years old at the time.

According to the child, one night she went next door to
babysit for Chrissy's two younger children while Chrissy went
out to play bingo.  The child had just finished using the
upstairs bathroom when the defendant called her into Chrissy's
bedroom.  The defendant pushed her onto the bed, took off her
pants and underwear, got on top of her, and "sticked his dick in
[her] vagina."  At some point he stopped, and the child put her

underwear and pants back on.  Then the defendant put his hand underneath her clothes and put his finger inside her vagina.

After this, the two of them went downstairs to the parlor, sat on the couch, and watched television.  The child testified that the defendant grabbed her hand and "tried to make [her] touch his dick," but she did not actually touch him.  The child did not remember where Chrissy's children were during these events.  When Chrissy returned, the child went back home without saying anything to anyone.

b.  The child's traumatic history.  Much evidence was introduced, some preemptively by the Commonwealth and some on cross-examination, that the child suffered from a number of difficulties.  She had special education needs, was "classified as being mildly mentally retarded," and had bipolar disorder. She had a leg injury:  when asked about her leg, she explained that her "patella went out of place" when she "got out of the shower and [her] leg gave out and [she] fell six times."

In addition, the child had been raped by an older male cousin when she was seven or nine years old.  She was at her aunt's house when her cousin, who was in the bathroom, said "come here" and "showed [her] his thing."  They went into a bedroom and were watching television when the cousin "pulled [her] pants down and he sticked his dick in [her] vagina."

The incident with the cousin traumatized the child. She started having flashbacks, in which upsetting thoughts of her cousin came to her involuntarily. She would "see him on the wall." In these flashbacks it would feel like her cousin was touching and hurting her again, and it scared her. She started seeing counsellors and therapists to help her deal with the effects of this traumatic event.

Defense counsel also elicited testimony on cross-examination that the child had witnessed an older female cousin and the cousin's boy friend having sex. Around this time, and before the incident with the defendant, the child shaved off all of her pubic hair, even though she was not yet shaving her legs or armpits. After the incident with the defendant, in her flashbacks she would see the defendant's face on the wall instead of her cousin's.

c. The therapist's testimony. Less than two weeks before trial the Commonwealth moved in limine to present the child's therapeutic mentor, Jill Larson, as the first complaint witness, instead of the child's father. See Commonwealth v. King, 445 Mass. 217, 241-248 (2005), cert. denied, 546 U.S. 1433 (2006). After a hearing held on the eve of trial, the judge allowed the motion.

At trial, while explaining the nature of her relationship with the child,[2] Larson testified, over objection, that she was "aware of [the child's] difficulties in processing information," and that the child looks at the world "in a very black-and-white . . . manner."  The judge allowed the prosecutor to pursue this line of questioning to establish an "appropriate contextual background," although he indicated that "at some point, it will be enough."

After additional questioning in this vein, Larson began to testify that the child had difficulty "engaging in play."  Defense counsel objected again and, at sidebar, informed the judge that the Commonwealth had disclosed, just the day before, that Larson would testify that the child "was unable to engage in pretend princess play and that she lacked the higher order of thinking."  Defense counsel argued that testimony regarding the child's thought processes required expert testimony and that "her inability to play princess play" was not relevant.  The judge ruled that "some limited questioning regarding facts in this area" would be relevant, but cautioned the Commonwealth not

---

[2] After graduating from college, Larson attended a four-year clinical program for social work and obtained a master's degree. At the time of trial she was working as a foster care social worker and child protective worker in Maryland.  She saw the child weekly from September, 2011, through April, 2012, as a therapeutic mentor, and was "involved in all her care plans," knew all her diagnoses, was "aware of all her therapeutic issues, and . . . her cognitive delays."

to elicit opinion testimony about the child's "tendency to tell the truth or fantasize or anything like that."

Larson then explained that the child "struggled with imagination play, which really is a core piece of therapeutic mentoring." She described an outing to "Plaster Fun Time," where the child was given "a scenario of being princesses" and "had to pretend that we were painting a castle and we had to slay the dragon. And [the child] really got frustrated because she wasn't able to really higher-order think . . . ." At this point, the judge sustained defense counsel's objection and forcefully instructed the jury to "disregard the last part of the answer about inability to engage in a higher-order thinking."

Redirected to describe the incident at Plaster Fun Time, Larson resumed her testimony, stating that the child "became upset when she wasn't able to participate like the other children who were being able to pretend that they were princesses and being able to come up with characters and name their dragons and she wasn't able to make a story line." Larson then testified about a regularly scheduled therapeutic mentoring session with the child, during which the child disclosed being sexually assaulted by the defendant.[3]

_____

[3] Over the defendant's objection, Larson also testified that she was a mandated reporter because she was "in a position of

d.  Closing arguments.  Defense counsel argued that the jury should discredit the child's testimony because "[h]er story about Pachoo is too close to her story about her cousin," her testimony was inconsistent, and there was no physical evidence. Rhetorically addressing the possible argument that "she's not sophisticated enough to do pretend play, so she's not sophisticated enough to get up on the stand and make a purposeful lie," counsel argued that the child did not intentionally give false testimony, but rather that she was "confused" about the facts, confused about her sexuality, and influenced by "her recurring and intrusive memories of [her cousin] in the weeks before accusing Pachoo."

The prosecutor countered that the details of the incident with the cousin differed from the child's description of what the defendant did to her.  She argued that the child "doesn't have the wherewithal and the sophistication to add the details," and that "[t]he details about what Pachoo did to her come from the reality of her experiencing it."  With respect to the therapeutic mentor's testimony, the prosecutor said, "Think about what Jill Larson told you about how [the child] didn't even have the ability to come up with a storyline about

_____

working with children or adults," and, as such, she was required "to report abuse, neglect or anything that is reported to us by anybody that we are working with objectively."

princesses, how she struggled with that, how frustrated she got. She's not intelligent enough, she's not sophisticated enough to perpetuate a cold, calculating fabrication."

Discussion. Evidence that the child was unable to engage in imaginative play, or that she got upset because she was unable to pretend to be a princess or slay a dragon at Plaster Fun Time, should not have been admitted. "To be admissible, evidence must meet 'the threshold test of relevancy,' that is, it must have a 'rational tendency to prove an issue in the case.'" Commonwealth v. Petrillo, 50 Mass. App. Ct. 104, 107 (2000), quoting from Commonwealth v. Fayerweather, 406 Mass. 78, 83 (1989). See Mass. G. Evid. § 401 (2017). Larson's testimony obviously was not probative of anything that occurred between the child and the defendant. Nor did it tend to prove the content or circumstances of the child's disclosure of her "first complaint" to her therapist. While some background facts may have been admissible to put the child's relationship with Larson into context, cf. Commonwealth v. Rosario, 430 Mass. 505, 508 (1999), the challenged testimony went beyond the background of their therapeutic relationship and into an attenuated collateral matter.

We recognize that "[t]he relevance threshold for the admission of evidence is low," Commonwealth v. Arroyo, 442 Mass. 135, 144 (2004), that a judge has wide discretion in determining

what evidence is relevant, see Commonwealth v. Alphas, 430 Mass. 8, 16-17 (1999), and that evidence can be relevant without directly establishing a fact of the case. See Mass. G. Evid. § 401, at 37 ("To be admissible, it is not necessary that the evidence be conclusive of the issue. . . . It is sufficient if the evidence constitutes a link in the chain of proof"). And evidence regarding the child's ability to engage in imaginative play did have potential probative value on one issue in the case: whether her account of the rape by the defendant was true, or whether she made it up.

However, it is well established that "[n]o witness, neither a lay witness nor an expert, may offer an opinion regarding the credibility of another witness." Commonwealth v. Quinn, 469 Mass. 641, 646 (2014). See Commonwealth v. Montanino, 409 Mass. 500, 504 (1991) ("longstanding rule that witnesses may not offer their opinions regarding the credibility of another witness"). "It is the province of the fact finder, not the witness, to determine the weight and credibility of testimony." Commonwealth v. Ward, 15 Mass. App. Ct. 400, 401-402 (1983). Vouching for the credibility of a witness, whether explicitly or implicitly, is impermissible. Quinn, supra at 646-647.

Notwithstanding this limitation, the Commonwealth contends that Larson's testimony was relevant "in light of the defense, which was to attack the victim's credibility and suggest that

she may have conflated the two incidents of rape." While the Commonwealth's argument does have some superficial appeal, it does not survive scrutiny.

The defendant permissibly pursued a variant of a <u>Ruffen</u> defense. See <u>Commonwealth</u> v. <u>Ruffen</u>, 399 Mass. 811, 815 (1987) ("If the victim had been sexually abused in the past in a manner similar to the abuse in the instant case, such evidence would be admissible at trial because it is relevant on the issue of the victim's knowledge about sexual matters"). His defense was that the child used the details of the rape by her cousin to accuse the defendant, not intentionally or maliciously, but rather as a product of trauma and confusion. The defendant did not suggest that the child engaged in an imaginative exercise to come up with her accusations against him. Sadly, although the child had no experience being a princess, she did have experience being raped. Evidence demonstrating the child's inability to engage in imaginative play had no bearing on the defendant's claim that the child was confusing or conflating her real life experiences.

Thus, the Plaster Fun Time incident was relevant only for an improper purpose: to suggest to the jury that the child was incapable of lying and therefore must have been telling the truth. A reasonable juror hearing the child's therapist testify that the victim saw things "in a very black-and-white . . . manner," was not able to pretend like other children, and

"wasn't able to make a story line," could think that the therapist was implicitly vouching for the child's credibility. See Quinn, supra at 647. "While the proposed testimony fell short of rendering an opinion on the credibility of the specific child before the court, we see little difference in the final result. It would be unrealistic to allow this type of . . . testimony and then expect the jurors to ignore it when evaluating the credibility of the complaining child." Commonwealth v. Ianello, 401 Mass. 197, 202 (1987). Viewed in this light, the admission of Larson's testimony was an abuse of discretion.

Having determined that the testimony was improperly admitted, we must consider whether it was prejudicial. Because the defendant timely and forcefully objected to the testimony, we apply the prejudicial error standard from Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). "An error is not prejudicial where it 'did not influence the jury, or had but very slight effect.'" Quinn, supra at 650, quoting from Commonwealth v. Christian, 430 Mass. 552, 563 (2000).

The child's credibility was the only issue in the case. The only witness other than the child and Larson was the child's father, who was not a percipient witness or even a corroborating witness. No physical evidence was presented. See Montanino, 409 Mass. at 504-505 (improper use of opinion testimony to

bolster victim's credibility reversible error where victim "was the key prosecution witness" and "his credibility was a crucial issue"); Commonwealth v. Velazquez, 78 Mass. App. Ct. 660, 666-668 (2011) (improper vouching by pediatrician who interviewed victim held to be prejudicial where case rested on victim's credibility). Contrast Commonwealth v. Rather, 37 Mass. App. Ct. 140, 149-150 (1994) (impermissible endorsement of victims' credibility harmless where "various aspects of the victims' testimony were corroborated by other witnesses").

Although Larson was not permitted to testify as an expert, based on her qualifications and relationship with the child, she "acquired the veneer of an expert." Commonwealth v. LaCaprucia, 41 Mass. App. Ct. 496, 500 (1996). The danger of implicit vouching is heightened "where, as here, the witness is testifying to actual interaction with the child." Ibid. See Commonwealth v. Brouillard, 40 Mass. App. Ct. 448, 451 (1996) (testimony "intermingling [witness's] role as treating therapist, expert on behavioral characteristics of sexually abused children, and fresh complaint witness, had the effect of impermissibly vouching for the [child's] credibility"); Velazquez, supra at 667.[4]

_____

[4] We express no opinion about whether a properly qualified expert could testify about the perceptive or expressive abilities of a person with the child's disabilities. Cf. Commonwealth v. Rather, 37 Mass. App. Ct. at147-148 (while

In addition, in closing argument, the prosecutor focused on Larson's testimony for its improper purpose, arguing that the child "doesn't have the wherewithal and the sophistication to add the details," and that, as Larson had told the jury, the child "didn't even have the ability to come up with a storyline about princesses, how she struggled with that, how frustrated she got. She's not intelligent enough, she's not sophisticated enough to perpetuate a cold, calculating fabrication." Although the argument was properly based on the evidence admitted at trial, see Commonwealth v. Lamrini, 392 Mass. 427, 433 (1984) (although "there was no misconduct in the prosecutor's summation because he relied on a ruling by the judge, we conclude that the judge's ruling was error"), it served to focus the jury on Larson's testimony for the wrong reasons.

Given the nature of the improper testimony, the use that was made of it at trial, the strong possibility that the jury may have considered it as vouching for the child's credibility, and the absence of any evidence other than the child's word, we cannot be confident that the jury's verdict was not substantially swayed by the error. See Quinn, 469 Mass. at 650 (error prejudicial where "we cannot say [improper admission of

expert testimony explaining delayed disclosure by sexually abused children is generally admissible, "the line between proper testimony as to patterns of disclosure of child sexual abuse victims and improper testimony constituting endorsement of the credibility of a victim-witness is indeed a narrow one").

expert's implicit vouching] did not influence the jury's evaluation of the victim's credibility").  Accordingly, the judgments are reversed, and the verdicts are set aside.

<u>So ordered</u>.